IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2016

**STATE OF TENNESSEE v. DEMARCO WATERS**

**Appeal from the Criminal Court for Shelby County**
**No. 13-01885     James M. Lammey, Jr., Judge**

───────────────

**No. W2015-01366-CCA-R3-CD  -  Filed August 10, 2016**

───────────────

The defendant, DeMarco Waters, was convicted by a Shelby County Criminal Court jury of premeditated first degree murder; three counts of attempted first degree murder, Class A felonies; attempted second degree murder, a Class B felony; and four counts of employing a firearm during the commission of a dangerous felony, Class C felonies. The defendant was sentenced to an effective term of life plus seventy-seven years. On appeal, the defendant argues that the evidence is insufficient to sustain his convictions and that the trial court abused its discretion in ordering consecutive sentencing. After review, we affirm the judgments of the trial court. However, we remand for entry of a corrected judgment in Count 6 to indicate that the conviction offense is a Class A felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; Harry E. Sayle, III (on appeal); Mary K. Kent and William N. Muller (at trial), Assistant Public Defenders, for the appellant, DeMarco Waters.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Hagerman and Colin A. Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted for the premeditated first degree murder of Marvin Cole; the attempted premeditated first degree murders of Edris Conley, Justin Buckner, Avan Hardy, Roderick Conley, and Tevin Wright; and five counts of employing a firearm during the commission of a dangerous felony – the attempted murder counts, arising out of his entering Roderick Conley's apartment and firing at the occupants.[1]

Mary Cole, Marvin Cole's mother, testified that her son was twenty-one years old when he was killed, and that he and the defendant had been friends since junior high school.

Roderick Conley testified that he lived in the Eldorado Apartments in September 2012. On September 4, he was playing dominos in his apartment with the defendant, Avan Hardy, Justin Buckner, Edris Conley, Tevin Wright, and Marvin Cole. The defendant went outside to make a phone call and, when he came back in, Marvin Cole, who was larger than the defendant, would not move his chair out of the way to let the defendant pass. An argument ensued between the two men, and the entire group went outside to continue the argument. It was heated but did not become physical. Things calmed down after five or ten minutes, and the group went back inside. However, the group began ribbing the combatants, and the defendant kept saying, "[T]hat ain't right." The defendant eventually left to buy more beer, vowing not to share it.

Roderick Conley testified that the rest of the group left to buy more beer shortly after the defendant. They saw the defendant at the store, surrounded by some other men Roderick did not know. They bought a twelve-pack of beer and returned to Roderick's apartment. Roderick heard a knock on the door about ten to twenty minutes after the group got back to the apartment. Roderick went to the bathroom and, when he came out, the defendant was in the house. In an "all business" manner, the defendant approached Marvin Cole on the couch where he was sitting, said something like, "I see you st[r]apped up, huh," and then shot him. Everyone in the house scattered to take cover; Roderick balled up in the corner. Roderick recalled hearing the defendant say, "I need one more round," as he left after the shooting.

Roderick Conley testified that, other than the defendant, the only other person in the room with a gun was Marvin Cole. He said that Mr. Cole's gun "was originally [the defendant]'s gun. That's what the whole altercation supposed to have been about[.]" However, Roderick said that Mr. Cole never took the gun out of his pocket. Roderick owned a twenty-gauge, single-barrel shotgun, but it was unloaded and in his bedroom

---

[1] Because there are a number of victims in this case, we will refer to each by name instead of designating anyone "the victim." Additionally, because two of the witnesses share the same surname, we will refer to them by first name only at times to prevent confusion. We mean no disrespect by this practice.

2

under his bed during the incident. Roderick recalled that, in addition to Mr. Cole, Justin Buckner was shot three times and Edris Conley was shot once or twice.

Avan Hardy testified that he was at Roderick Conley's apartment the day of the shooting, and he testified similarly to Roderick with regard to the events of the evening. Mr. Hardy elaborated that there "was tension in the air" between the defendant and Mr. Cole over a .32 caliber pistol that Mr. Cole had taken from the defendant about a week before and that Mr. Cole had in his possession that night. Mr. Hardy recalled that, when they were at the store buying beer, he heard the defendant say, "I need a strap, ASAP," which Mr. Hardy understood to mean a gun. Mr. Hardy also recalled that when they returned to Roderick's apartment, the defendant knocked on the door, they asked who it was, and the defendant responded, "Killer." Mr. Hardy heard the defendant ask Mr. Cole if he had "some more shots" just before shooting him. Mr. Hardy stated that the defendant "[s]hot at everybody" in the apartment and that he was afraid. Mr. Hardy described the defendant's demeanor as "calm" when he walked toward the couch to shoot Mr. Cole. After the defendant stopped shooting at everyone, Mr. Hardy heard him yell, "I need another round," before running off.

Justin Buckner also testified similarly with regard to the events of the evening. Mr. Buckner recalled that the initial argument between the defendant and Mr. Cole that occurred when the defendant returned to the apartment after using the phone involved "tussling" and "wrestling," not just words. Mr. Buckner also recalled that, when the group later encountered the defendant at the store while buying beer, the defendant was upset about his dispute with Mr. Cole and would not let it go. Mr. Buckner also elaborated about what occurred when someone knocked on the apartment door after they returned from buying beer. He said that he asked who was at the door and the person knocking responded, "Killer." Mr. Buckner said, "Killer?" The person knocking responded, "Yeah, Killer." Mr. Buckner responded, "Man, you better stop playin' for to get shot th[r]ough the door." At that time, someone else opened the door, and they saw it was the defendant. Mr. Buckner stated that the defendant entered the room and walked toward the couch, asking the group if they had gone to get more guns. They answered, "No," and the defendant pulled out his gun and started shooting. When the defendant started shooting, Mr. Buckner jumped up and tried to get away, but the defendant shot him three times. Mr. Buckner was hospitalized for over a month.

Tevin Wright also testified similarly with regard to the events of the evening. Mr. Wright elaborated that the defendant was calm throughout the entire incident, from the time he entered the apartment, fired the shots, and then left. Mr. Wright said that no one threatened the defendant prior to the defendant's starting shooting. Mr. Wright stated that he had never met the defendant before that night and that the defendant never pointed his gun at him during the incident.

3

Edris Conley[2] also testified similarly with regard to the events of the evening. Edris recalled hearing a knock on the door and the person knocking responding that it was, "Killer." Edris further recalled that one of the other men in the apartment said, "You better stop playing, Killer, or we're gonna shoot through the door." The person knocking then responded, "No, I'm just playin' – this [the defendant]." Edris said that he was sitting on the couch next to Mr. Cole listening to music when the defendant entered the room. Edris noticed the gun and looked up about the time the defendant started shooting. The defendant first shot Mr. Cole and then started shooting around. Edris tried to move away but was shot in the leg. He said that the defendant fired several times, looked around, and then walked out, expressing the need for another round. Edris underwent eight surgeries and had a metal rod placed in his leg, which makes his leg stiff and causes his knee to lock up. He has foot drop and ankle contractions. Edris said that he had never met the defendant prior to the shooting.

Gary Nelson, an EMT with the Memphis Fire Department, testified concerning what he encountered, as well as his actions, when he responded to the scene of the shooting.

Officer Lee Walker, a crime scene technician with the Memphis Police Department, photographed the scene and collected evidence. Officer Walker observed dominos on the kitchen table and casings and projectiles around the living room. He found a total of seven forty-five caliber shell casings throughout the apartment. A thirty-two caliber revolver was found in the pants pocket of Mr. Cole, the murder victim. No spent thirty-two caliber bullets were found at the scene, although outside the apartment Officer Walker found a live thirty-two round. A bullet fragment was found under Mr. Cole's body. Officer Walker located a twenty-gauge shotgun under the mattress in the bedroom.

Dr. Karen Chancellor, Chief Medical Examiner for Shelby County, testified that Mr. Cole's cause of death was a gunshot wound to the head. A major part of the bullet and some bullet fragments were recovered from Mr. Cole's head. It could not be determined from what range the shot had been fired, and Dr. Chancellor could not say what position Mr. Cole's body was in when hit.

Cervinia Braswell, a forensic firearms examiner with the Tennessee Bureau of Investigation, determined that the forty-five caliber shell casings recovered from the scene were fired from the same weapon. She also determined that the bullets and bullet fragments recovered from the individuals who were shot were all forty-five caliber

---

[2] Edris Conley is of no relation to Roderick Conley.

bullets, but due to the bullet material she could not conclusively say they were shot from the same weapon.

Jonathan Davis, a clerk in the Shelby County Criminal Court Clerk's Office, authenticated an envelope addressed to the criminal court with a return address of the defendant at the jail.

Officer Odell Underwood, an employee of the Shelby County Jail, testified that a letter mailed by the defendant was returned to the jail as undeliverable. As part of his duties, he opened and read the letter, and he realized it was a request to have people assaulted or killed. Officer Underwood forwarded the letter to the homicide bureau because the purported sender, the defendant, had a murder case pending.

Detective Robert Wilkie with the Memphis Police Department testified that all of the surviving victims identified the defendant as the shooter from photographic arrays. Detective Wilkie interviewed the defendant, and the defendant gave a statement denying shooting anyone. The defendant claimed that the victims had him confused with someone else as he was with his aunt at the time of the shooting. Detective Wilkie interviewed the defendant's aunt, and she said that she did not see the defendant after 2:00 p.m. on the day in question and was therefore not with him at the time of the shooting. Three or four months later, Detective Wilkie also reviewed the letter that was mailed by the defendant but returned to the jail. Detective Wilkie said that the letter requested that someone ask "Fred," an individual who lived in the apartment next door to the scene of the shooting, to let him know when the victims were there so that a "surprise party" for the witnesses could be implemented to keep them from testifying. Detective Wilkie took it as a request to kill the witnesses before the defendant's preliminary hearing.

Michael Colburn, a crime scene officer, lifted fingerprints from the aforementioned letter purported to have been mailed by the defendant. Martin Miller, a fingerprint examiner, testified that a fingerprint found on the letter matched the defendant.

Following the conclusion of the proof, the jury acquitted the defendant of Counts 10 and 11, the offenses against Tevin Wright. The jury convicted the defendant, as charged, of the remaining counts with the exception of Count 2, in which he was convicted of the lesser-included offense of the attempted second degree murder of Edris Conley rather than attempted first degree murder.

The defendant was sentenced to life imprisonment on the murder conviction. The court imposed an eight-year sentence on the attempted second degree murder conviction,

fifteen years on each of the attempted first degree murder convictions, and six years on each of the convictions for employment of a firearm during the commission of a dangerous felony.  Finding that the defendant was a dangerous offender, the court ordered that all of the sentences be served consecutively for an effective term of life plus seventy-seven years.

## ANALYSIS

### I.  Sufficiency of the Evidence

The defendant first argues that the evidence is insufficient to support his convictions for the premeditated first degree of Marvin Cole or the attempted first degree murder of Roderick Conley.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of

innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is defined as "[a] premeditated and intentional killing of another[.]"  Tenn. Code Ann. § 39-13-202(a)(1).  "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment.  "Premeditation" means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.  The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime.  See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).  Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation.  Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing.  State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part."  Tenn. Code Ann. § 39-12-101(a), (a)(2).

The defendant claims there was no evidence that he came back to the apartment with the intent to kill Marvin Cole.  He asserts it was apparent that he was joking when

he announced himself as "Killer." He further asserts that he knew Mr. Cole was armed and that he did not shoot Mr. Cole until Mr. Cole started to get up from the couch. He summarizes that "[t]here was no evidence that up to that moment he intended anything more tha[n] to defend himself and recover his property from Mr. Cole, who was armed."

In the light most favorable to the State, however, the proof shows that the defendant was motivated by his anger at how he believed he was disrespected by Mr. Cole and the other men in the group before he left the apartment. After leaving the apartment, the defendant was overheard at a store saying he needed a "strap," meaning a gun. When the defendant returned to the apartment and was welcomed inside, he did not display his gun until he went directly to Mr. Cole and shot him, which indicates use of the element of surprise to keep the victims from defending themselves. The defendant then turned his attention to the others in the room and began firing at them. When the defendant ran out of ammunition, he was overheard saying, "I need another round," as he left the apartment. This evidence shows that the defendant had a motive, procured a weapon prior to the attack, was calm in the moments before he began firing, used the element of surprise to keep the victims from defending themselves, only stopped his attack because he ran out of ammunition, and failed to render aid to any of the wounded after the shooting. This evidence is sufficient for a rational trier of fact to find that the defendant's killing of Mr. Cole was premeditated.

The defendant also claims that there was no evidence that he shot at or threatened Roderick Conley, who was balled up in a corner until the shooting stopped. The proof shows that the defendant began firing around the room after murdering Mr. Cole, and everyone in the room scrambled for cover. Mr. Conley balled up in a corner of the room because he was afraid of being shot. A rational trier of fact could infer from the defendant's actions that he was intent on killing as many people as he could after shooting Mr. Cole and that it was only by sheer luck and the defendant's running out of ammunition that Mr. Conley avoided being shot, not because of any lack of intent on the defendant's part. The defendant clearly did not want to leave any witnesses behind, evidenced by his subsequent letter requesting for a "surprise party" for the survivors so they would be unable to testify against him. The evidence is sufficient to support the defendant's conviction for the attempted first degree murder of Roderick Conley.

## II. Sentencing

The defendant also argues that the trial court abused its discretion in ordering that he serve his sentences consecutively. He asserts that the trial court based its finding solely on the severity of the crimes of which he was convicted and that the extended sentence is not necessary to protect the public from further criminal acts by him.

8

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including the one the trial court found applicable in this case – that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(4).

When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). Our standard of review for a trial court's order of consecutive sentencing is abuse of discretion with a presumption of reasonableness. State v. Pollard, 432 S.W.3d 851, 859-60 (Tenn. 2013).

As an initial matter, the convictions for employing a firearm during the commission of a dangerous felony are required by statute to run consecutively. See Tenn. Code Ann. § 39-17-1324(e)(1).

In this case, the trial court found that the defendant was a dangerous offender. The court noted that the defendant had some prior convictions but relied solely on the instant offenses in deciding to impose consecutive sentencing. The court noted that the defendant's only motivation for the crimes was the victims' "mak[ing] fun of him," and that the act of trying to shoot everyone in the apartment was "senseless" and showed "particular malice." The court found that the circumstances surrounding the commission of the offenses were "particularly aggravated" and that the aggregate length of sentence reasonably related to the defendant's crimes. Although the trial court did not make an explicit finding that the length of sentence was necessary in order to protect the public from further criminal acts by the defendant, such finding was implicit in its ruling. The record supports the trial court's determination that the defendant was a dangerous offender.

In any event, even if there was error in finding the defendant to be a dangerous offender, the court appropriately imposed consecutive sentencing upon finding that the defendant had an extensive record of criminal activity given his present convictions. This court has repeatedly held that "[c]urrent offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Carolyn J. Nobles, No. M2006-00695-CCA-R3-CD, 2007 WL 677861, at *12 (Tenn. Crim. App. Mar. 7, 2007) (citing State v. Cummings, 868 S.W.2d 661, 667 (Tenn. Crim. App. 1992)); see, e.g., State v. Kyle Ronald Fencl, No. M2012-01265-CCA-R3-CD, 2013 WL 3976060, at *8

9

(Tenn. Crim. App. Aug. 5, 2013), perm. app. denied (Tenn. Nov. 13, 2013); State v. Darius Jones, No. W2010-01080-CCA-R3-CD, 2011 WL 2162986, at *3 (Tenn. Crim. App. May 26, 2011), perm. app. denied (Tenn. Sept. 21, 2011); State v. Mark Robert Carter, No. M2007-02706-CCA-R3-CD, 2009 WL 1349206, at *10 (Tenn. Crim. App. May 14, 2009), perm. app. denied (Tenn. Sept. 28, 2009). A trial court may impose consecutive sentencing after finding any one of the criteria in Tennessee Code Annotated section 40-35-115(b). The trial court did not abuse its discretion in imposing consecutive sentences in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. However, we remand for entry of a corrected judgment in Count 6 to indicate that the conviction offense is a Class A felony.

_____
ALAN E. GLENN, JUDGE